Frost, J.
delivered the opinion of the Court.
One of the objections made to the venire, in the first ground in arrest of judgment, is, that it was not in due form. This was explained in the argument to mean that the names of the jurors were not embodied in the writ, so as to be certified by the signature of the Clerk; but were arranged in lists below his signature. By reference to the books of practice, it will appear that the writ is merely a precept to-the sheriff to summon a jury, according to a list of the names or panel, annexed. The 10th section of the Act of 1839, copied from the Act of 1731, requires the panel, or roll of the jurors drawn, to be “ annexed” to the writ. The writ in this case conforms to the law and usage for more than a century.
The 10th section of the Act of 1839 directs the Clerk to issue the venire within twenty days after the adjournment of the Court. By the Act pf 1731, he was directed to issue it “ forthwith,” after the jury was drawn. The 2d section of the Act of 1799, which has not been altered, requires all judicial process to be made returnable, within fifteen days before the sitting of the Court. In the Courts at Westminster, the kind of process to be issued to summon a jury differs according to the Court from which it is awarded. In some cases there must be a particular precept to the sheriff, or writ of venire facias; in others, a general precept will suffice; or the whole may be merely a command to the sheriff to return a jury, ore tenus. The justices of jail delivery may have a panel returned by the sheriff, without any writ to warrant the process; and so may the King’s Bench, as to all indictments actually found in the county in which it is holden. Without inquiring into the changes of this practice, made by our Statute, it may be assumed that the writ should be returned within fifteen days before the sitting of the Court. In the case of the State v. Crosby, for horse-stealing, the venire was not delivered to the Sheriff until a few days before the sitting of the Court; and after the jurors had been summoned. In the judgment of the Court it is said, the important object of obtaining an impartial jury, is secured by the manner of drawing them, which is not, in the least, affected or controlled by the mode of summoning them; and it is obvious that, in prescribing the mode, the Legislature had nothing more in. view than to procure it promptly done. The writ of *40 venire was the authority of the sheriff; and as the process 0f ()ourt secured the attendance of the jurors, I am unable to see how the prisoner is affected by any irregularity in reSpeCf;, The objections to the issue and return of the venire in this case are thus completely answered.
2 Speers, in: ’
tat‘ '
S im'
Another objection is, that the impression of the seal of the Court is not apparent on the wafer and paper, affixed to the writ, as a seal. The case of the State v. Dozier only decided that the venire is part of the record, and that the omission of the seal was a defect in the process, sufficient to arrest the judgment. No seal, of any description, had been affixed to the writ. A seal to the venire is necessary only in compliance with the law which requires all judicial process to be issued under the seal of the Court. The Act of 1839 made no novel provision when it directed that “ the Clerk of each office should be provided with a seal of office, with a proper device and a screw;” and that all writs and process should be tested under the seal of the Court. The Act of 1792 contained the same provisions, except that a screw is not mentioned. Yet it has never been held that the impression of the die should be manifest on the seal of the Court, affixed to process, though, in this respect, it has been uniformly defective. By common consent it seems to have been deemed unnecessary, with such formality, to authenticate, for domestic purposes, the acts and proceedings of the Court. For the exemplification of the proceedings of the Court into other States only, has the pressure of the screw been applied to make such an impression of the seal, as may plainly identify it, should it be called in question. It would cause great practical inconvenience, without utility, if it were required that the seal of the Court should be impressed, by the screw power, so as to exhibit its device, on every writ of capias, sub-pcena, and execution, as well as venire, which may be issued from the Court. Chicanery would be encouraged to the detriment of justice, if inattention to such a mere technical form were permitted to arrest the proceeding of the Court. In Smith v. Allston, it was objected, when the case was called trial, that the seal on the writ had not the impression of the die, by which it might appear to be the seal of the Court. The objection was overruled because it was made too late. Judge Nott, who delivers the opinion of the Court, adds— “ But if the objection had been made at an earlier period, I think it ought not to have been sustained. The impression made by a seal, in the ordinary, hurried course of business, is frequently very slight, never indelible, and always liable to be effaced by time and accident. Its genuineness is more certainly determined by the manner of its authentication, than by the characteristic and distinguishing emblems, left upon its face. The duty of the Clerk of the Court is to *41 affix the seal of the Court to every judicial process. This duty he is sworn to perform. He has by his attestation declared that the seal affixed to the process, is the seal of the Court; and the Judge below was authorized to conclude it was so.” This opinion, though the judgment of the Court was not ed upon it, has always since been recognized as law and followed in practice; so that the seal, affixed to the process, has been recognized and admitted as the seal of the Court, though the impression of the device may not be apparent.
Rileys Casea,
8 Eagt ^ 1 ’
2 Bail, 505.
The objection that the names of the grand jurors were not inserted in the indictment, was conclusively settled in The State v. Cook.
The testimony of Sarah McElmurray, alias Sarah McDaniel, was not admitted until an issue was tried by a jury and they found that she was not the wife of the prisoner. So much only of the evidence was required by the ground of appeal, as was necessary to present the single point of law on which the jury were instructed that a divorce by the law of Georgia, being grantable in a Court of record, could be proved only by the record of the Court in which it may have been granted. This point, Lord EUenborough, in the case of the King v The inhabitants of Castell, briefly decided by affirming, “ It cannot be argued that a record can be proved by any witness.”
Cochran was the first witness sworn for the prosecution, and was separated from the other witnesses of the State, when his examination was closed. He could not be aided in giving his testimony, by their statement; nor they, by his. The object of separating witnesses is to prevent their hearing the testimony of each other and being thereby assisted in preserving consistency in a fabrication. By the presence of Cochran in Court when the solicitor opened the case to the jury, with a brief outline of the evidence he expected to produce, the defendant was not deprived of the means of detecting inconsistencies in the testimony of the witnesses for the State; nor his security against combination impaired.
In the State v. Anderson, the Judge permitted the jury, in a capital case, to be discharged from the adjournment of the Court, one day, until it was convened, the next. That is sufficient authority for the Judge to permit one juror to retire, for a brief time, from the jury box.
The affidavits of Cochran and Sarah McDaniel were not produced at the trial, — and that of Cochran has not been here presented to the Court. This would, in ordinary cases, be a sufficient answer to the 6th ground for a new trial; but it is proper, in favor of life, to consider the objection. Sarah McDaniel, in her testimony, did not fix the time when the prisoner and herself left their house to go to Scott’s. But she said, on her way home from Tobin’s, she met Turner; and *42 it was about an hour after she got home, that the prisoner and herself set out for Scott’s. Turner said he got to Tobin’s about an hour after sunrise. In the affidavit she says it was “about eight o’clock” they set out for Scott’s. The variance is, between 8 o’clock and two hours after sunrise. In her testimony, the witness said that when they set out to go to Scott’s, they left Stallings standing in the room; and on their return, they found him lying asleep near the fodder stack, by the path from the prisoner’s house to Scott’s. In the affidavit, it is said Stallings “ went from the prisoner’s towards Scott’s, and before he got to Scott’s, he lay down.” The want of precision, as to the time, in the witness’ affidavit, who is an ignorant person, and whose attention may not have been called to the importance of exactness, is not sufficient to impeach the truth of her evidence. The fact that Stallings was at the prisoner’s when the witness and the prisoner set out for Scott’s, and that they found him lying near the fodder stack, when they returned, is not contradicted by the affidavit. The statement in the affidavit that Stallings went from the prisoner’s towards Scott’s, and before he got to Scott’s he lay down, does not necessarily imply, as has been argued, that Stallings left the house before the witness. The rest of the affidavit, which sets out the material facts, is in strict conformity with the testimony of the witness, at the trial.
The memorandum of the testimony of the witnesses, examined before the Coroner, taken by a person who was present, would not be competent evidence, if it were proved. The witness was not offered at the trial, though he was present in Court; and it would be relaxing the rules of evidence to a degree entirely inconsistent with the administration of the criminal law, if it may be assumed, in behalf of the prisoner, that the witness, if offered, would not have been admitted, and the omission to offer him be allowed as a cause for a new trial.
In support of the 5th ground, that the testimony of the witnesses was insufficient and contradictory, it has been chiefly urged, that the testimony of Sarah McDaniel is not to be credited, because falsified in a material circumstance, when she stated that, on the prisoner’s return from the fodder stack to the house, he threw something like an axe over the fence; and it is said there is no proof of any fence between the house and the fodder stack, which was about 300 yards from the house. Sarah McDaniel certainly affirms, in the statement impeached, that there was a fence; and no witness has said there was not. It is not improbable the house of the prisoner may have had a space around, enclosed by a fence. The denial of the existence of such a fence rests entirely on the assertion of the counsel, who does not affirm any knowledge of the fact beyond what the evidence discloses.
*43 The uncertainty respecting the time when, by Sarah Me-Daniel’s statement, the prisoner left his house and went to the fodder stack, and also respecting the precise time when Mrs. Tobin saw him chopping at the stack, was much insisted on in the argument below. The jury were advised that, in this particular, it was indispensable that the testimony of the witnesses should coincide ; because the proof of the prisoner’s guilt, so far as it depended on the testimony of these witnesses, depended on their agreement. Sarah McDaniel got home about an hour after sunrise, which on the 23d Deer, was said to be 10 minutes after 7 o’clock. She was absent an hour getting breakfast. It was after breakfast, they set out for Scott’s. They were absent about half an hour, or three quarters, when they returned home. The prisoner then went to the fodder stack, where Stallings was asleep. Mrs. Tobin said it was 10 or 11 o’clock that she sent her nephew to Scott’s ; and he not returning as soon as she expected, she went to look for him. It was then she saw the prisoner chopping near the fodder stack. All the particulars of the evidence affecting this question were carefully submitted to the jury.
Apart from the testimony of these witnesses, the circumstances proved bear hard against the prisoner. The caution given to Mrs. Tobin, at her house, respecting the prisoner’s declared intention to kill Stallings; — the threat renewed, when suddenly awakened, at his own house; the blood spattered on his clothes; his declaration that he had not seen Stallings after he left the house, — the dead body found in his enclosure ; his reluctance to go where it was, and his emotion in its presence; his contradiction there, that he had last seen Stallings at that place; his hesitation or denial to own his axe, until charged with it by the witness who had sold it to him — his declaration that he had cut fresh meat with it,— the blood and hair which the axe exhibited, — his agitation when carried back to the house, and the attempts to pick the blood off his clothes, when his back was turned to the persons present; — these circumstances present strong evidence of guilt. When to them is added the direct testimony of Mrs. Tobin and Sarah McDaniel, if they are credible witnesses, of which the jury were the only competent judges, the verdict is confirmed by evidence, so direct, consistent and cumulative, that the Court can discover no ground on which to remand the case for a new trial.
The motion is refused.
O’Neaul, J. and Evans. J. concurred.